NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

NORTHERN ARIZONA HEALTHCARE CORPORATION, an Arizona non-profit corporation, *Petitioner*,

*v.*

MATTHEW SHANE BICKHAM, a single male, *Respondent*.

No. 1 CA-SA 26-0132

FILED 08-13-2026

Petition for Special Action from the Superior Court in Coconino County
No. S0300CV202400608
The Honorable Roberta J. McVickers, Judge *Pro Tempore*

**JURISDICTION ACCEPTED; RELIEF GRANTED IN PART AND DENIED IN PART**

COUNSEL

Broening Oberg Woods & Wilson, P.C., Phoenix
By Jay A. Fradkin, Patrick D. White, Kelley M. Jancaitis
*Counsel for Petitioner*

Miller, Pitt, Feldman & McAnally, P.C., Phoenix
By Zubin M. Kottoor
*Counsel for Respondent*

---

## MEMORANDUM DECISION

---

Presiding Judge Daniel J. Kiley delivered the decision of the Court, in which Judge D. Steven Williams and Judge Cynthia J. Bailey joined.

---

**K I L E Y**, Judge:

¶1 Petitioner Northern Arizona Healthcare Corporation ("NAH") seeks special action relief from an order compelling the disclosure of certain documents to Respondent Matthew Shane Bickham. For the following reasons, we accept jurisdiction, grant relief in part, and deny relief in part.

## FACTS AND PROCEDURAL HISTORY

¶2 In October 2022, Bickham underwent outpatient surgery at NAH's facility in Flagstaff. After his discharge, he was injured when he fell while attempting to move from a wheelchair into a curbside vehicle outside of the facility. Alleging that he fell because Kelsey Glassberg, the NAH technician who was helping him out of the wheelchair, unexpectedly "detached her grip and let go of [him,]" Bickham filed negligence and other claims against NAH.

¶3 Shortly after the incident, Glassberg prepared a written account, known as "the Glassberg Report," that she entered into NAH's remote data entry system. At a later deposition, Glassberg testified that she "limited" her account to "the facts of what occurred[.]" An NAH risk manager met with Glassberg to take her statement about the incident, taking notes while asking her questions. NAH risk management personnel then exchanged emails and other written communications among themselves. These notes and written communications are known as "the Additional Materials."

¶4 Bickham sought disclosure of the Glassberg Report and the Additional Materials. NAH objected, asserting that the materials were statutorily privileged. *See* A.R.S. §§ 36-445.01, -2403; Patient Safety and Quality Improvement Act of 2005 ("PSQIA"), 42 U.S.C. §§ 299b-21 to 299b-26. When the parties were unable to resolve their dispute, NAH moved for a protective order.

**¶5** After full briefing and argument, the court denied NAH's motion for a protective order. The court found that the Glassberg Report and the Additional Materials were not privileged under *John C. Lincoln Hosp. and Health Ctr. v. Superior Court*, 159 Ariz. 456 (App. 1989), and further found that they were not protected by PSQIA because they were created pursuant to Arizona regulatory requirements. The court therefore ordered NAH to disclose the Glassberg Report and the Additional Materials.

**¶6** NAH seeks relief from the ruling by special action.

## DISCUSSION

**¶7** Special action jurisdiction is appropriate when there is no "equally plain, speedy, or adequate" remedy by appeal. Ariz. R.P. Spec. Act. 12(a). Because NAH lacks an adequate remedy by appeal to challenge the court's order compelling the disclosure of documents over its privilege objection, we accept special action jurisdiction here. Ariz. R.P. Spec. Act. 12(b)(2); *see also Sun Health Corp. v. Myers*, 205 Ariz. 315, 317, ¶ 2 (App. 2003) ("Because an appeal offers no adequate remedy for the prior disclosure of privileged information, special action jurisdiction is proper to determine a question of privilege.").

**¶8** NAH asserts that the Glassberg Report and the Additional Materials are privileged under federal and state law.

**¶9** "Privilege statutes are strictly construed because they impede the truth-finding function of the courts." *Azore, LLC v. Bassett*, 236 Ariz. 424, 427, ¶ 9 (App. 2014) (citation modified). The party claiming the privilege bears the burden to "make a prima facie showing that [the privilege] applies to each contested item." *Naranjo v. Sukenic*, 254 Ariz. 467, 476, ¶ 34 (2023) (citation modified). "Upon a prima facie showing of privilege, the party contesting the privilege must demonstrate a good faith basis" to believe "that an in camera review would reveal waiver of the privilege or establish an applicable exception." *Id.* (citation modified). "Whether a privilege exists is largely a question of law, which we therefore review *de novo*." *Twin City Fire Ins. Co. v. Burke*, 204 Ariz. 251, 254, ¶ 10 (2003). We likewise review the interpretation of statutes *de novo*. *Huber v. Ariz. Naturopathic Physicians Med. Bd.*, 261 Ariz. 43, 47, ¶ 11 (App. 2025).

## I. Arizona Statute

**¶10** NAH argues, first, that the superior court erred by determining that the Glassberg Report and the Additional Materials were

not protected by A.R.S. §§ 36-445 *et seq.* and 36-2401 *et seq.* (collectively, "Arizona's Privilege Statutes").

¶11 Section 36-445 requires hospitals and outpatient surgical centers to "review the professional practices within" the institution to "reduc[e] morbidity and mortality" and improve "the care of patients[.]" A.R.S. § 36-445. Section 36-445.01 exempts records and materials prepared in connection with these mandatory peer reviews from disclosure in civil litigation. The statutory confidentiality requirement "protects the peer review process itself — the discussions, exchanges and opinions found in the committee minutes," *Yuma Reg'l Med. Ctr. v. Superior Court*, 175 Ariz. 72, 75 (App. 1993) (citation omitted), to encourage candor in peer review proceedings. *See Humana Hosp. Desert Valley v. Superior Court*, 154 Ariz. 396, 400 (App. 1987) (observing that the "confidentiality of peer review committee proceedings is essential to achieve complete investigation and review of medical care" because the committees' "deliberations would terminate if they were subject to the discovery process").

¶12 Section 36-2402 requires hospitals and outpatient surgical centers to conduct "quality assurance activities[,]" including "activities or proceedings" to "improv[e] the quality of health care" under "a process adopted by" the institution under "written standards and criteria." A.R.S. §§ 36-2401(3), -2402. Section 36-2403(A) provides that "[q]uality assurance information shall be confidential and is not subject to subpoena or order to produce" except in licensing, disciplinary, or peer review proceedings. Under Section 36-2403(E), however, "information that is otherwise discoverable does not become confidential based solely on its submission to or consideration by a health care entity conducting confidential quality assurance activities."

¶13 In applying Arizona's Privilege Statutes, we are guided by our decision in *John C. Lincoln Hospital*. In that case the plaintiff, who was admitted to the defendant hospital after a car accident, unexpectedly experienced organ failure resulting in permanent injury. 159 Ariz. at 457. In the ensuing lawsuit, the trial court granted the plaintiff's request to compel the production of the hospital's incident report and minutes from certain trauma/critical care committee meetings that were held during her hospitalization. *Id.* at 458. Noting that "[o]ne of the purposes of A.R.S. § 36-445" is to "free" internal reviews "from the inhibiting concern" that candid communications would be used against the providers in subsequent litigation, the *John C. Lincoln Hospital* court had no trouble finding the minutes of the committee meetings "within the statutory ambit" and therefore exempt from disclosure. *Id.*

4

¶14 The Court reached a different conclusion, however, with respect to the incident report. While "discussions, exchanges and opinions" relating to peer reviews are statutorily protected from disclosure, the Court noted, that statutory protection did not extend to "raw factual information" merely because it "may trigger such discussions, exchanges and opinions." *Id.* The statutory privilege does not, in other words, cloak "otherwise discoverable factual information" from discovery merely because that information may be submitted for use in a peer review proceeding. *Id.* (citation omitted). Incident reports, the Court observed, are prepared "in the regular course of providing medical care . . . whenever there is an unusual occurrence of any kind." *Id.* at 459. Although incident reports "sometimes precipitate peer review," the Court held, "they do not always do so," and "are not made solely for that purpose." *Id.* Because the incident report at issue was not made "solely" in connection with the peer review process, the *John C. Lincoln Hospital* court held that the incident report was not statutorily exempt from discovery. *Id.* The *John C. Lincoln Hospital* court therefore affirmed the trial court's order compelling disclosure of the incident report. *Id.*

¶15 The record shows that the Glassberg Report constitutes an eyewitness account of Bickham's fall. The record indicates, and NAH does not dispute, that the Glassberg Report contains no information other than Glassberg's own recollection of her observation of the events. As such, the Glassberg Report constitutes the type of "raw factual information" that Arizona's Privilege Statutes do not exempt from disclosure. *See id.* The superior court did not err in determining that Arizona's Privilege Statutes do not shield the Glassberg Report from disclosure. *See also Yuma Regional*, 175 Ariz. at 76 ("[T]he peer review privilege does not protect information that originated outside the peer review process and that is discoverable from alternative sources.").

¶16 The Additional Materials present a more difficult question. The record does not indicate that the superior court conducted an *in camera* review of the Additional Materials, and the record is insufficient to enable us to determine whether the Additional Materials fall, in whole or in part, within the protection of Arizona's Privilege Statutes. Emails and other communications exchanged by NAH risk personnel are privileged if, for example, they reveal peer-review deliberations. *See Takieh v. O'Meara*, 252 Ariz. 51, 59, ¶ 27 (App. 2021) ("[T]he internal workings and deliberative process of peer-review committees are immune from discovery." (citation modified)); *see also Yuma Regional*, 175 Ariz. at 77 ("[A] plaintiff is not entitled to engage in a fishing expedition to ascertain what information was

considered by the peer review committee where such information might reveal the deliberative process of the participants.").

¶17          On the other hand, the risk manager's contemporaneous notes of her post-incident interview with Glassberg are not privileged to the extent they reflect factual statements made by Glassberg about the incident. *John C. Lincoln Hospital*, 159 Ariz. at 459 (holding that peer-review privilege did not extend to "raw factual information"); *see also Yuma Regional*, 175 Ariz. at 77 (noting that "basic factual information" that "does not reveal anything about the internal workings or deliberative process of the peer review proceeding" is "not protected by the peer review privilege"). The extent to which the Additional Materials include the type of "raw factual information" that falls outside the scope of Arizona's Privilege Statutes is a matter that can only be determined by an *in camera* review of the Additional Materials.

## II.     **PSQIA**

¶18          NAH next argues that, in any event, the Glassberg Report and the Additional Materials are privileged under PSQIA. In view of our holding above, we need only address whether PSQIA protects what Arizona's Privilege Statutes do not: the Glassberg Report and any purely factual information about the incident that is contained within the Additional Materials.

¶19          PSQIA established "a voluntary, confidential, non-punitive system of data sharing of health care errors for the purpose of improving the quality of medical care and patient safety." *Charles v. So. Baptist Hosp. of Florida, Inc.*, 209 So.3d 1199, 1204 (Fla. 2017). The act allows healthcare providers to voluntarily share patient safety information with federally certified groups known as "patient safety organizations," which analyze the data and recommend strategies to improve patient safety. *Daley v. Teruel*, 107 N.E.3d 1028, 1031-32 (Ill. App. 2018), citing 42 C.F.R. pt. 3.; *see also Baptist Healthcare System, Inc. v. Kitchen*, 727 S.W.3d 362, 367 (Ky. 2025) ("Under the PSQIA, medical providers may . . . report medical errors to a patient safety organization, which then uses the collected information in an endeavor to learn from those errors and thereby improve the safety of healthcare."). To encourage healthcare providers to disclose patient safety information to patient safety organizations without fear that their disclosures may be used against them in civil litigation, PSQIA provides confidentiality and privilege protections to "patient safety work product" ("PSWP"). 42 U.S.C. § 299b-22; *see also Kitchen*, 727 S.W.3d at 367 ("[T]he PSQIA privileges [PSWP] from discovery in order to incentivize providers

to participate in the program."). PSWP is broadly defined to include "data, reports, records, memoranda, analyses . . . or oral or written statements" that are:

(1) "assembled or developed by a [healthcare] provider for reporting to a patient safety organization" and which are, in fact, so reported;

(2) "developed by a patient safety organization" for the purpose of "improv[ing] patient safety, health care quality, or health care outcomes"; or

(3) "identify or constitute the deliberations or analysis" of a patient safety evaluation system.

42 U.S.C. § 299b-21(7)(A). "[I]nformation that is collected, maintained, or developed separately, or exists separately, from a patient safety evaluation system" is not PSWP and therefore not protected by the privilege. 42 U.S.C. § 299b-21(7)(B)(ii); 42 U.S.C. § 299b-22. The term "patient safety evaluation system" is defined as "the collection, management or analysis of information for reporting to or by a patient safety organization." 42 U.S.C. § 299b-21(6); *see also Daley*, 107 N.E.3d at 1037, ¶ 34 ("A provider's overall process of collecting [PSWP] in order to report the information to a patient safety organization is considered a 'patient safety evaluation system.'").

¶20 Here, in determining that PSQIA did not protect the Glassberg Report and the Additional Materials from disclosure, the superior court found that NAH had an obligation to compile them under Arizona Administrative Code ("A.A.C.") §§ R9-10-203(C)(1)(m) and R9-10-204(B)(1)(a). The former requires hospitals to "establish[], document[], and implement[]" "[p]olicies and procedures" that, *inter alia*, "[c]over quality management, including incident report and supporting documentation." A.A.C. § R9-10-203(C)(1)(m). The latter requires hospitals to "establish[], document[], and implement[] . . . an ongoing quality management program" that includes a "method to identify, document, and evaluate [patient safety] incidents[.]" A.A.C. § R9-10-204(B)(1)(a). Because the Glassberg Report and the purely factual portions of the Additional Materials constitute documentation of a patient safety incident within the meaning of those administrative rules, we agree with the superior court that the Glassberg Report and the purely factual portions of the Additional Materials fall within the scope of these provisions, and therefore are not protected by PSQIA. *See Kitchen*, 727 S.W.3d at 369-70 (holding that PSQIA did not protect from disclosure incident report of a hospital patient's fall

because incident report was created to comply with hospital's "regulatory obligation to track incidents at its facility . . . rather than as part of [hospital's] patient safety evaluation system"); *Charles*, 209 So.3d at 1215 (holding that PSQIA did not protect from disclosure adverse incident reports because "Florida statutes and administrative rules require providers to create and maintain them," and thus the reports constituted "information collected, maintained, or developed separately . . . from a patient safety evaluation system"); *see also* HHS Guidance Regarding Patient Safety Work Product and Providers' External Obligations, 81 Fed. Reg. 32655, 32657 (2016) ("[PSQIA] was intended to spur the development of *additional* information created through voluntary patient safety activities and to provide privilege and confidentiality protections for such *new* information. It was not intended to protect records generated or maintained as part of providers' existing mandatory information collection activities." (emphasis in original)).

**¶21** In support of its position, NAH cites *In re BayCare Med. Group, Inc.*, 101 F.4th 1287 (11th Cir. 2024) for the proposition that PSQIA's protection extends to information that was created in part for non-PSQIA related purposes. In *BayCare*, a doctor who was fired after committing surgical errors filed an employment discrimination suit against her former employer, BayCare, and sought disclosure of BayCare's "internal documents about the performance of other doctors who were not fired despite also committing errors." *Id.* at 1288. The district court compelled the disclosure of the documents on the grounds that PSQIA did not apply because BayCare created the documents not "solely" for the purpose of reporting to a patient safety organization, but also for "internal safety analysis and peer review[.]" *Id.* at 1290. The Eleventh Circuit Court of Appeals granted relief to BayCare on writ of mandamus, holding that the fact that BayCare created and used the disputed documents for multiple quality assurance purposes, and not solely PSQIA-related purposes, did not take the documents outside the scope of PSQIA's protection. And, of particular significance here, the *BayCare* court expressly noted that the disputed documents were not used to "satisf[y] state reporting requirements[,]" nor were they "created or maintained separately to meet any external obligations[.]" *Id.* at 1292. The *BayCare* court's holding that information is not outside the scope of PSQIA's protection merely because it was created for multiple internal quality assurance purposes provides no support to NAH's position here because, unlike the disputed documents in BayCare, the Glassberg Report and the purely factual portions of the Additional Materials were created pursuant to an external obligation imposed by state regulatory requirements. A.A.C. §§ R9-10-203(C)(1)(m), R9-10-204(B)(1)(a).

**¶22**       Because the Glassberg Report is not privileged or confidential under either Arizona's Privilege Statutes or PSQIA, we affirm the superior court's order compelling its disclosure. Likewise, to the extent that the Additional Materials contain "raw factual information" about the incident (such as the risk manager's notes reflecting Glassberg's statements about the incident), such information, too, would fall outside the protection of Arizona statute and PSQIA. An *in camera* review of the Additional Materials will, therefore, be necessary to determine if it contains information that is subject to disclosure. In all other respects, we grant relief and vacate the order compelling the disclosure of the Additional Materials other than purely factual information contained therein.

## CONCLUSION

**¶23**       We accept jurisdiction, grant relief in part, deny relief in part, and remand for further proceedings consistent with this decision.



**MATTHEW J. MARTIN • Clerk of the Court**
**FILED**:          JR